Next case. Next case is 2016 1390 and 1466. Mr. Nowak is it? Nowak, okay. Good morning, Your Honor. May it please the court, I'll begin with the claim construction issue. On June 10, 2015, the District Court decided, I mean, I'm sorry, the Federal Circuit ruled that claim construction in this case that oxidizing must be an active step and cannot mean doing nothing or allowing it to oxidize on its own. Now the District Court interpreted that language in a different way and I quote, the District Court said, in other words, some amount of oxidation in excess of which occurs naturally from exposure to ambient air must be caused by an active step during the Wouldn't it be invited error? Because at the at the status conference after remand, that's exactly what you said to the District Court, didn't you? At the status conference, Your Honor, yes, yes. The other, my opponent has said that my comment on the increase of the of the oxidation rate, what I was referring to and I can give you the quote, I was referring, when I said it, this is what we, I think my statement was, this is what we decided all along. That quote was based on Konica's prior counsel and I, let me find the, yeah, on a comment by Konica's prior counsel and I cite to the court at the Appendix 2424. During this, the Texas claim construction, Konica's prior counsel said the increase in number, or the increase word, was meant to emphasize the difference between passive and the oxidizing agent, which is an active step. All I was referring to in that statement is to that statement. I certainly didn't say anything that there, that we had to prove a baseline level of oxidation and then on top of that, prove an active level of oxidation, which was greater than the baseline. And I would submit to the court, I don't control claim construction in this case, you do. So my comment was only referring to that previous statement by Konica's prior counsel. I wasn't advocating a baseline that, or that we had to show something in excess of that baseline. Now, under the Federal Circuit's claim construction on June 10th, Konica was required to prove that an active step results in oxidation, no more no less. Under the District Court's construction, we were now required to prove a baseline level of oxidation and then something in excess of that level. But what do you view as active? I'm sorry? I mean, what do you think the concept of an active step means? Ah, well, if you look at this active step that Dr. Sherman identified in his expert report, right, he identified a washing step and a blow drying step. That certainly is different than doing nothing or allowing it to He also identified a step after extraction, which was another washing step, right? That, again, was certainly not doing nothing or allowing oxidation to occur on its own. I mean, I submit it doesn't take an expert to figure out that that's an active step as opposed to a passive step of doing nothing. Dr. Sherman's opinion was not accepted, though, was it? No, Dr. Sherman's opinion was not accepted for several reasons, Your Honor. First of all, the District Court, however, did not refer to Paragraph 159 of Dr. Sherman's expert report, which did not use the word can. I have to go to a different tab for this. Paragraph 159 in Dr. Sherman's report said, one of only two steps in the process of making an oxidation step is to would further understand that oxygen is an effective oxidizing agent and that exposure to oxygen in air and an aqueous solution, which is water, would result in conversion to an oxidized product. The District Court did not refer to that paragraph in Dr. Sherman's report. She only referred to Paragraphs 119 and 152, which used the word can. I suggest that in Paragraph 159, Dr. Sherman said what is actually a scientific fact, actually, what is happening during the wash and... Wasn't the trial court's reason for excluding Dr. Sherman's report primarily because she thought his report was based on a claim construction that she no longer believed was in play? That's the second reason, Your Honor, absolutely. So let me address the claim construction issues. There's two sets of claim construction, the 2012 claim construction and the 2014 claim construction. The District Court rejected the 2000, our Conaca's 2000 claim construction and ZMC's 2012 claim construction for the same reason. That was based on the unreliability of Conaca's claim construction. The only argument she cites to reject both sets was the unreliability of Conaca's claim construction. Now, Dr. Taylor, ZMC's expert, said our data, I'm representing Conaca, our data was unreliable because we refrigerated the samples before we did the tests. Dr. Taylor, ZMC's expert, said that their data was unreliable because they froze the samples, tested, and when those dead microorganisms were thawed, they would burst into a metabolism that was greatly increased. So, our data, I'm not arguing that the court should have relied on our data because we built a mobile lab, as you see from our brief, to resolve that issue. Right, so that issue is not even with respect to your evidentiary challenges, the issue of whether your data comes in is not on the table. Right, it's ZMC data that's on the table. That's correct, Your Honor. Okay, so now in terms of Dr. Taylor's reason for excluding that data, it was the thawing issue, right? Now, Dr. Sherman in the district court cites his testimony on that issue, says there's absolutely no support for the theory that dead cells will suddenly revive and there will be additional activity after they're thawed. Right, that's Dr. Sherman's opinion. But the main argument that ZMC makes is that CONICA has to prove that there was peer review of that data before it would be reliable and we could use it. Putting aside for a moment, Dr. Taylor's reason, which is disputed. Right. Okay. I thought you, again, I thought you just told me you weren't challenging that order that said that the refrigerated data was unreliable. I'm talking about two sets of data, Your Honor. Okay, so frozen data is theirs. Frozen data is ZMC's data. Right. Refrigerated data is our data. Right, and that's not an issue. Okay. I'm only relying on the ZMC data. I apologize if I confused it. Yes. Maybe I'm going too fast. I'm only relying on the ZMC data. The ZMC says it's unreliable because of the thawing issue, which I just stated. It also says it's unreliable because we did not show that we could, that that method was peer reviewed. Right, the thawing method was peer reviewed, the freezing and thawing method was peer reviewed. ZMC, let me address the peer review issue, right, which is the main issue. I refer the court to A14276. There is the testimony of Dr. Alfred Sporman, who was the expert for the XKGC, for XKGC and the ITC proceedings, and he was being cross examined on the freezing method. Right. And let me just read this into the record because it's important. Right. What he was talking about is what happens after you take the sample and you decide whether to refrigerate or freeze the cells, he said. And he says, what do you do with those cells? And the data shows that unless you rapidly freeze the cells, and that's what everybody in the field will ultimately do. And he goes on to say, the very best way to stop metabolism is to freeze the cells, and that's basically the standard in the field. So let me summarize what I just said. First of all, Dr. Taylor's report, or opinion I should say, that there's some metabolism increase after thawing, there's absolutely no support for that at all, and he gave none. The second reason is that we had to point to peer review of their results. That's what I just did. Dr. Sporman, who was not even GMT's expert, said that's the best way to stop metabolism is to freeze the cells, and that's basically the standard in the field. So for that reason, not alone, but for that reason, I suggest, Your Honor, that their data is reliable. We should have been able to rely on it. Dr. Sherman should have been able to rely on it. And the other reason that his report was rejected based on speculation, that was based on the word can, and I corrected that with paragraph 159. Okay, so let me address, go to the next issue. The time on your watch isn't what matters. I'm looking at that, Your Honor. But you do have time. All right, the other issue is whether Dr. Sherman relied on an incorrect claim to destruction. That's the other keystone issue here in this case. First, let me say that Dr. Sherman read the June 10th decision, discussed it with counsel, and decided that his report was in compliance with that decision. It certainly wasn't ignoring the June 10th decision. So ZMC points to three differences between the June 10th decision and Dr. Sherman's report to argue that he relied on the wrong report. So let me address each of those briefly. The first was oxidizing cannot be interpreted as doing nothing or to simply allow oxidation to occur on its own. Familiar language. What ZMC was saying is Dr. Sherman did not point to any active steps. As I said before, he pointed to two active steps, washing and drying before extraction and washing after extraction. And as I said, it doesn't take an expert to say they're active to certainly not doing nothing. But most importantly, ZMC admits that those are active steps. And I refer the court to A1652 lines 24 and 25. But are they active oxidizing steps? Well, I'm getting to that. That's the next. That's number three, Your Honor. They certainly are active steps and ZMC admits it. So there was no reason for him to revise his report based on that reason. The second reason was that the active steps must occur in a claimed order, meaning something before extraction, something after extraction. Dr. Sherman identified a step before extraction and after extraction, and they were not production steps. So certainly there was no reason to revise based on the second reason. He wanted to save three minutes. You can continue or save. I've got to get your third reasoning, Your Honor. The third reason is oxidation requires some step that results in oxidation. Again, paragraph 159 says it. The word can is not in there. And the ZMC data that Dr. Sherman relied on is not unreliable. And that says it, which I'll try to explain when I have some additional time. In fact, ZMC admits that oxygen causes oxidation. Dr. Taylor agrees with that. And Judge Malloy, if you look at page, I think it's 416, I believe, page 16 of the decision, Judge Malloy agrees that the data in those two active steps causes oxidation. It's in her decision. So with that, I'll save my remaining two minutes. We will save it for you. Mr. Rosenthal. Good morning, Your Honor. May it please the Court. This case is about causation. The Federal Circuit, in the Kingdom Way decision, decided that oxidation requires an active step that results in oxidation. The reason that the Court correctly granted summary judgment is that Conaca has not put forward any evidence, zero evidence, of causation. There is no evidence that anything... And in the ZMC data, which measures oxidation, shows that after the post-fermentation washing step, the ratio of reduced COQ10 to oxidized COQ10 went from 81 to 26.9. That was the first study. In the second study, from 88 to 55. Under either study, that definitely shows a reduction in oxidation. I don't know whether or not that's more than or less than what would occur in a passive state, but isn't that a question of fact for a jury? They've definitely demonstrated that oxidation has occurred directly after the washing step, that there is a significant input from your data. So why isn't that enough to survive summary judgment? Because there's absolutely nothing that tells us why that oxidation is happening. When you look at that data, you see oxidation happening throughout the process, not just in the drying step, not just in the washing step. It happens throughout the process when you look at those tables. Well, that's true. It happens throughout the process. It's a really significant jump, based on the evidence in your first study, from 81% to 26% just during the washing phase, and you don't see a similar percentage jump during any other phase of the process. I mean, is this a fact question? Why should I be deciding whether that, the most significant jump in oxidation in your data, directly after the washing step, isn't at least a fact question as to whether the washing step is therefore causing the oxidation? The answer is that this process takes days and days and days, and each one of the steps takes different amounts of time. But isn't that a fact question? I'm not an expert. Those are active steps. One of them is an active step. Why is that not enough? Everything that we do is an active step. The question is, what's causing oxidation? I think I can answer Judge Moore's question with two things. Why are we deciding this? Why aren't we letting the jury decide this? There's two reasons. First, the only thing that Conaca put forward, as far as evidence, is their expert report. The judge, in her discretion, decided that that expert report has to be thrown out because it used the wrong claim construction. That's number one. Okay, so if we disagree with you on the claim construction... Then I have a response to that. ...then that ground for throwing out the report is gone. If you believe that... But you also said that that's the only evidence they put forth. That's the only evidence in the record. The ZMC study is in the record. All of that evidence is evidence in the record. True. It's not thrown out. True. And that shows significant amounts of oxidation occurring during particular steps... Your Honor, we don't... ...performed in your process. Maybe they didn't need to put on anything affirmative in light of that record evidence. All that that evidence shows is that oxidation occurs. They were asked, specifically by Judge Malloy, Judge Malloy said, how are you going to prove active oxidation? And counsel said, I'm going to have Dr. Sherman put in what's in his report. And she said, well, what if I exclude Dr. Sherman's report? What are you going to do then? And this is what counsel said. That's a problem. We can't rely on the other evidence. That doesn't work. Dr. Sherman has to describe these steps. What that was was a clear admission that they have no other evidence in the record. That's not an admission they have no other evidence. They're trying to persuade her not to exclude it because it leaves them without an expert when you've got an expert. But the record contains evidence. I really don't see how I can decide this fact question. The nature of the fact question is they've shown you've admitted washing is an active step. It occurs. You all presented a study that shows at least one study during that washing step, there's this significant amount of oxidation that has occurred. Granted, it varied from the first study to the second study. But that's all fact nonsense. That's not for me to work out. I'm no expert. And maybe it's not the result of oxidation. But you can then demonstrate that. It's your study. You can respond to that evidence at a trial. So the problem is that there is zero evidence about why that oxidation is happening. What your question is, if I can answer it. Why do we have to have a why? Because the Federal Circuit... If there's an active step and it occurs, that's all that the claim construction requires. No, you're wrong. The Federal Circuit in its decision in Kingdom Way said that this step requires an active step. So you said, isn't that enough? No. An active step, that results in oxidation, as Judge Lori said, an active oxidation step. So if we have an active step that results in oxidation, who cares why it does? It doesn't result in oxidation. There's no evidence that it results. Let me try to explain. It's just because it happens at the same time doesn't mean it happens because of. One thing that I think may or may not be clear throughout this entire... I mean, at least it's a genuine question of fact as to whether it happens because of. It doesn't... You're right. It may not cause it. But the question isn't have they proven it. The question is have they raised a question of fact about whether it's caused. Exactly. And, Your Honor, the only thing that they've done is they've speculated. During this entire process, all of this material, this goop, is sitting out in the air. It's oxidizing all the time. So it sits out for five or six or seven days and there's substantial oxidation. Sure. The question is why. Is that the result of something that we have done? You can make those arguments to the jury because those are exactly what the jury should decide. Sure. Those kinds of fact questions. The jury should decide it, but they should have evidence to decide it on. They shouldn't be guessing. The Supreme Court in 1986 said in order to defeat a summary judgment motion, you have to put evidence forward. But there's no dispute that the washing and the drying would cause oxidation. There's certainly a dispute about that. There's absolutely a dispute about whether it actually causes oxidation. The only evidence in the record, our engineers said it, their experts said it, is that those things, since they contain oxygen, could theoretically cause oxidation. What we know for sure is that throughout the entire process, it's exposed to ambient air, which has oxygen in it. That is certainly causing oxidation. What we don't know is whether these other things are causing oxidation. This is a very, very complex chemical reaction. When you look at what happens— You need to argue this to the jury. The problem is the jury doesn't have to guess. Here's what the jury is being asked to do. The jury doesn't have to guess because you're a smart guy. You're going to put on evidence. You're going to have an expert that's going to stand in front of them and explain to them exactly how the process works. My guess—yeah, you're the smart guy I'm referring to. Don't keep pointing at yourself. You're also going to put on some evidence that shows if nothing was done for seven days and it sat in the open air, it would oxidize from this percent to this percent, so obviously it's not the washing step that's doing it. I mean, you know, this is easy. This is easy for you to offer, for them to offer, and the jury will figure out whether or not it's the washing step that does it. We don't have enough information to make that call. The problem is, Your Honor, they don't have any evidence. They don't even have an expert. When you look at the record, the expert does not even say, I think that part of these steps, I think that washing and drying actually is causing— Is discovery closed on the case? Yes, it is. Yes. And they had every opportunity to supplement their report. They were asked whether they want to. They said, we don't need to. Well, he does point to those as the active steps that cause oxidation, doesn't he? No, Your Honor. He points to those steps as active steps. He doesn't use the word active, but he says these are things that they do, and when you look, I have to address paragraph 159, which is now what they've pointed out. They said, oh, he actually does talk about causation. Look at paragraph 159. They never cited that in their briefs, but put that aside. That's dealing with a different limitation in Claim 15, which is not at issue in this case. That's not Claim 22. It's not Claim 33, and it has to do with an oxidation agent. Totally different limitation. So there's nothing in the two sections that the expert actually addresses Claim 22 and 33 that address whether or not these steps cause oxidation. There's only three paragraphs in each section, and in all of them, what the expert says is, it may cause oxidation, it can cause oxidation, it theoretically could cause oxidation, and we agree, and we also agree, Your Honor, that oxidation occurs. But what we don't agree with is that there's any evidence that the jury could rely on to find that oxidation occurs as a result of these steps because there's so much going on in this chemical reaction. The jury should be asked this question if they had some evidence before the jury that the jury could do anything other than guess. Here's what the jury's being asked. Look at this complex chemical reaction. At the end of it, it's all oxidized. Why do you think that happened? No, you have a study that actually goes section by section through the process, your study demonstrating how much oxidation occurs at the various stages. I mean, during the washing step, you demonstrate that all this oxidation occurs. After the drying step, you demonstrate the oxidation went from 26.9 to 21.3 in the first study, from 55 to 18 in the second study. I mean, you have a study that demonstrates that during each of these phases, oxidation is occurring. Correct, correct. But post hoc is not ergo proctor hoc. In other words, just because oxidation is happening doesn't mean it's happening because of anything we're doing. And the jury is free to reach that conclusion. But there's nothing on which the jury could reach the conclusion either way. Yes, there is, because if the jury puts together the fact that there are active steps occurring and that the oxidation changes to such a level after these washing and drying steps, the jury is free to conclude that, therefore, that quintessential factual question of causation has been established. But how can the jury make that conclusion when the only piece of evidence— Some of it's common sense. You know what? When my kids go into the kitchen and the cookie jar lid is off and the thing is empty and the kid's got cookie all over his face, I'm not positive he ate him. I'm not positive he took him out of the cookie jar. I'm not even positive he could reach the cookie jar. But I feel like a jury could conclude he did based on that. There wasn't a smoking gun, but he's covered in cookie. You know, why isn't that kind of like what we have here? I'm not positive. Nobody saw for sure the washing step causing oxidation, and maybe there's not a study in this record that demonstrates an equal amount of oxidation would have occurred in ambient air absent no activity. Maybe there could even be a study that shows in ambient air with no activity, more oxidation would have occurred than occurred here. The water did result in oxidation, but less oxidation that would have occurred because the parts of oxygen in water are less than in ambient air. Maybe you could do all that. Would it help you, Mr. Rosenthal? Maybe we could order the district court to reopen discovery. Would that help your case? Because then you can put in all those studies that would help establish whether or not the washing step does cause it, since I think that's a question of fact, but you don't think it is, so maybe there should be more discovery below. So let me answer all three of those points. First of all, with respect to your cookie analogy, the situation here is your kids have been eating cookies all day. There's crumbs all over them. You've seen them eating cookies all day. The question is, did they eat cookies out of that jar? I don't know. I know that they have crumbs, but the jury is being asked, did they come out of that jar or not? The jar is empty. The jar is empty, but you know what? They've been eating cookies all day permissively for all around the house. Well, you know what? Once again, I'm a bad mommy because I should have punished them in that situation. In that situation, they're punished. But my point is this. No, but your point is that somehow circumstantial evidence doesn't constitute viable evidence, and it does, and the jury is told every single time that a jury is instructed that direct evidence and circumstantial evidence are both, in fact, valuable evidence, and the law makes no distinction between the two. So we cannot discount circumstantial evidence. I don't want you to discount circumstantial evidence, but here's the problem. The circumstantial evidence could be the result of two different things. One of them is certainly happening. Passive oxidation is happening throughout this process. Everybody agrees. Now, we're also doing something, and the question is, is what we're doing also causing oxidation? And the jury is asked in a vacuum with no help. Well, but your own studies show a dramatic increase. They show an increase because the process takes a very long time. Well, and that's what you tell to the jury. They have to decide by preponderance of the evidence on a quintessential fact question, which is causation. They have to decide, but they have to decide with some facts that they can rely on, not just guesswork. This is chemistry. Can't your expert testify? He's not excluded. Your expert can testify, right? Certainly our expert can testify. So he can explain to the jury whether he thinks this step is resulting in oxidation or not. But we don't bear the burden of proof. In order to get to a jury, they've got—this is the Supreme Court encephalotex. They have to put forward some evidence of causation. They have zero— They have to put forward a question of fact about causation. It is a question of fact. And your evidence established that for them. Well, here's the problem. The problem is, what you're saying is there's a lot of oxidation. Therefore, can't we assume that that oxidation is the result of this? Can't the jury— No, wait. No, not can we assume. Is there a question of fact, a genuine dispute of fact, over whether that oxidation is being caused by that step? Mr. Rosenthal, our lighting system has not been operating correctly. And, therefore, you have not been made aware that you are in your rebuttal time. But we will give you— I see. That is why. Okay. Thank you. Excuse me. Continue. You've got a minute left. Thank you, Your Honor. Let me ask you about this. You argue that none of the court's evidentiary rulings are in any way wrapped up into this proceeding and that we shouldn't address any of those. Now, the exclusion of Dr. Sherman's report does expressly relate to the question of oxidation and the question of claim construction. Absolutely. Okay. But here's— So the question about the motion to compel as it relates to your data. Yes. The trial court, in its final judgment, in paragraph 5 says, likewise, the party's rights pursuant to Federal Rule Civil Procedure 37 in regards to this court's memorandum and order denying defendants' motion to compel remain intact. What does that mean? I think it means that those orders stay in place if the case is remanded, that they're not vacated or voided or mooted. See, that's not the way I read that. I read that because she's putting it in the same paragraph where the party's rights pursuant to Rule 54 remain intact. So it seems to me that she is contemplating that the ability to appeal from that denial remains intact. It may be that that's an interpretation you can have. It doesn't matter. In this case, this is not an abuse of discretion. She granted that motion to exclude or did not grant the motion to compel, I should say, on that material. I'm sorry, are we talking about the 2014 test results that we allegedly have? We're talking about the materials that you have. And there's a motion for reconsideration that's still pending. Well, that's the motion for reconsideration on Dr. Sherman. On Dr. Compton. But with respect to that issue, she ruled, the court ruled, that it was untimely because it was a year and a half late. Okay, but what I'm trying to understand is, is she asking that this be incorporated into this judgment? That's not how I read that. I read that as that these remain intact for subsequent appeal if there's ever a point at which it were relevant to a final judgment that it would be subject to appeal. But in any event, we're happy to handle it on the merits if you think that it should be handled on the merits. She ruled that something's untimely, and there's no abuse of discretion in that regard. Okay. Thank you, Mr. Rosenthal. Thank you, Your Honor. Mr. Novak used up most of his rebuttal time, but he gave Mr. Rosenthal a little extra time, so we'll give you your three minutes. No, Your Honor, my opponent kept saying that there's no proof that oxidation is actually occurring. I just go back to paragraph 159 that you can read. That's a scientific fact. Well, he doesn't – no, I don't think that's a fair characterization of his statement at all. He didn't say there's no proof oxidation is occurring. He said there's no proof that it's the washing step that's causing it as opposed to the ambient air since the washing step takes place over a series of days. I stand corrected. So paragraph 159 says that oxygen is an effective oxidizing agent in air or dissolved in water. So that's my point. He's saying that that paragraph related to a different claim? No, no, that's a scientific fact. He was talking about a different claim, but this was the one sentence in that paragraph, which is a scientific fact. It doesn't relate to any particular claim that oxygen in air and oxygen in water oxidizes reduced Q10 is a fact. It's a scientific fact. There's no dispute over that. That's what the – any expert would agree with that and even my opponent agrees with that, that oxygen in air and oxygen in water oxidizes the reduced Q10. There's no dispute over that. That's all he was saying. All right, let me add one more thing in my time. They're arguing that they rely on oxidation to incur in their production process based on passive oxidation, and the process doesn't last five days. Their typical process is like 105 hours or 110 hours, right? But it is a process. The process begins, as Judge Moore pointed out, with reduced Q10 at 81.8%. At the end of that process, there has to be – the reduced has to be gone and it has to be 100% oxidized. That's what their process is producing, oxidized Q10. And as Judge Moore pointed out, in each step in that process, there's a significant drop in that reduced level in the washing and drying steps and in the wash step after extraction. Those are included because you can't take the risk of you're going to end up with 0% at the end of the process with passive oxidation. You need those steps there to make sure that when you get to the end, you have all oxidized Q10. Now, what does Conica do? They use an oxidizing agent to do the same thing. After the extraction step, they have a chemical reaction that guarantees at the end of the process, you end up at zero. Any industrial process could not take the risk of at the end, you would end up with 25% reduced and 75% oxidized when your process is meant to make oxidized Q10. That's why those steps are in there, the wash and drying step before extraction and the step after extraction. And they are clearly causing oxidation and it's not from passive oxidation. I've just – I've got one second left. That's all I have, Your Honor. Thank you. Thank you, Mr. Novak. We'll take the case for an advisory. Thank you, Your Honor. All rise. The Honorable Court is adjourned until tomorrow morning. It's at o'clock a.m.